**SIGNED this 30 day of September, 2020.**

*Austin E Carter*

**Austin E. Carter**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 17-51682-AEC |
| Debra Ann Osborne | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| Khalliah Monique Shaw, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. Proc. No. 17-05057 |
| v. | ) | |
| | ) | |
| Debra Ann Osborne, | ) | |
| | ) | |
| Defendant/Debtor. | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Khalliah Monique Shaw ("Plaintiff" or "Ms. Shaw") commenced this adversary proceeding for a determination that an unliquidated debt arising from a medical malpractice claim owed by the Defendant and Debtor Debra Ann Osborne (the "Debtor" or "Dr. Osborne") is not dischargeable under 11 U.S.C. § 523(a)(2)(A).[1] The Court conducted a trial, heard the testimony of several witnesses, and received exhibits into evidence. After trial, each party submitted proposed findings of fact

---

[1] By prior order on the Defendant's motion for summary judgment, the Court entered judgment in favor of the Debtor as to the count in the Complaint brought under 11 U.S.C. § 523(a)(6). (Doc. 38).

and conclusions of law. After due consideration of the foregoing, the Court concludes, for the reasons that follow, that the debt is not excepted from discharge under 11 U.S.C. § 523(a)(2)(A).

The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (I). Venue is proper under 28 U.S.C. § 1409.

## I.    Findings of Fact.[2]

1. During all times relevant to this adversary proceeding, River Edge Behavioral Health Center ("River Edge") was a medical treatment facility with locations in Milledgeville, Georgia and Macon, Georgia.

2. Plaintiff received treatment at River Edge's Milledgeville location, beginning on December 19, 2013 and lasting into January 2014.

3. At that time, the Debtor, a psychiatrist, was Medical Director of River Edge, and worked primarily at River Edge's facility in Macon.

4. The Debtor held no ownership interest in River Edge and collected a fixed salary in exchange for her work as a physician and as Medical Director, with no incentives or bonuses related to volume of patient care.

5. As a Medical Director, the Debtor held a number of responsibilities (Plaintiff's Ex. 6), including to:

    a. provide clinical supervision and leadership in the clinical treatment team process;

    b. comply with and revise medication management protocols;

    c. provide pharmacologic services to clients in accord with accepted standards of care; and

---

[2] To the extent any of the Court's findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

     d.  provide supervision of Advanced Practice Registered Nurses and/or Physician Assistants.

6.  One Advanced Practice Registered Nurse was Julie Sanders ("Sanders"), who worked primarily in River Edge's Milledgeville location.

7.  Sanders held no ownership interest in River Edge and collected an hourly salary, with no incentives or bonuses related to performance.

8.  As an Advanced Practice Registered Nurse, Sanders holds a doctoral degree in the field of nursing.

9.  The Debtor served as the delegating physician for Sanders under the River Edge Nurse Protocol Agreement (the "Protocol Agreement"), which among other things authorized Sanders to prescribe medication, including lamotrigine(Plaintiff's Ex. 3A).

10. The Debtor considered the Protocol Agreement a "supervisory agreement."

11. The Debtor was aware that Sanders could not write prescriptions were it not for the Protocol Agreement.

12. The Protocol Agreement required the Debtor to, among other things:

     a.  ensure that Sanders received appropriate pharmacology training at least annually (Plaintiff's Ex. 3A, p. 5[3], ¶ 14);

     b.  periodically review patient records of treatment by Sanders, including an annual review of 10% of all such patient records (*Id.*, p.5, ¶ 12);

     c.  be available for consult with Sanders (*Id.*, p.3, ¶ 2); and

     d.  evaluate and follow-up with patients treated by Sanders "on a time interval determined by [the Debtor] in accordance with the

---

[3] In the Protocol Agreement page numbering begins on the second page of the document. Thus, for purposes of this opinion, the document's page numbers are disregarded, and the Court considers the first unnumbered page as page 1.

parameters of the acts delegated to [Sanders] and pursuant to such standards as may be from time to time determined by the Composite State Board of Medical Examiners." (*Id.*, p.4, ¶ 3).

13. The Protocol Agreement provided that the Debtor's practice address was River Edge's Macon facility (*Id.*, p.1).

14. The Protocol Agreement provided that Dr. Brin Foster was the "Other Designated Physician." Dr. Foster practiced primarily at the River Edge Milledgeville location (*Id.*, Form A).

15. Applicable regulations required the Debtor "to make certain that the medical acts provided by [Sanders] under the Protocol Agreement [were] commensurate with Sanders' education, training, experience and competence of [Sanders]." Ga. Comp. R. & Regs. 360-32-.05(3)(a)(1).

16. Applicable regulations provided that "as the delegating physician, [the Debtor] is responsible for all the medical acts performed by [Sanders]." Ga. Comp. R. & Regs. 360-32-.05(4).

17. In the Protocol Agreement, Sanders represents that she is a "registered professional nurse licensed by the Georgia Board of Nursing and recognized by said Board as a nurse practitioner." (Plaintiff's Ex. 3A, p.2).

18. The Protocol Agreement required Sanders to "exercise the requisite standard of care, defined as the exercise of at least that degree of skill, care and diligence as would ordinarily be rendered by advanced practice registered nurses generally under like and similar circumstances." (*Id.*, p. 3, ¶ 3).

19. Under the Protocol Agreement, Sanders was to use prescription forms that contain the name, address, and telephone number of the Debtor (*Id.*, p. 5, ¶ 10).

20. Sanders has sometimes introduced herself to patients as "Dr. Sanders," on account of doctorate of nursing degree.

21. When introducing herself to a patient as "doctor," Sanders generally would explain that her reference to "doctor" is due to her doctorate of nursing degree, and that she is not a medical doctor.

22. Staff at River Edge usually called Sanders by her first name, but sometimes referred to her as "doctor."

23. Plaintiff heard staff refer to Sanders as "Dr. Sanders." Plaintiff was told that she would see "the doctor" on a certain morning, and on that morning she was visited by Sanders.

24. Several diplomas and certificates on display in Sanders' office indicated she was a nurse.

25. Sanders introduced herself to Plaintiff as "doctor."

26. Sanders failed to qualify this representation or explain to Plaintiff that she was not a medical doctor.[4]

27. Sanders testified that she never intended to mislead anyone into thinking that she was a medical doctor.

28. During Plaintiff's treatment at River Edge, she visited Sanders' office, but Plaintiff did not notice the diplomas and certificates.

29. Sanders wore nothing that indicated she was a medical doctor, including a white coat or stethoscope.

30. Plaintiff believed that Sanders was a medical doctor and, as a result, did not ask to see a medical doctor at River Edge.

31. As part of her treatment of Plaintiff, Sanders prescribed lamotrigine.

---

[4] Although Sanders generally explained to patients that she was not a medical doctor, she could not specifically recall doing so here (nor does she recall whether she introduced herself as "doctor"). Plaintiff, on the other hand, testified that Sanders introduced herself as "doctor" and did not explain she was not a medical doctor. The Court finds this testimony by Plaintiff credible.

32. Lamotrigine carries a 'black box' warning, the most serious warning required by the U.S. Food and Drug Administration.  The warning indicates that an adverse reaction to lamotrigine may lead to death or serious injury (Plaintiff's Ex. 10, 11).

33. The labels on the prescription bottles for the lamotrigine indicated "Dr. Julie Sanders" and "Dr. Julie Use Osborne Sanders" as the prescriber (Plaintiff's Ex. 15).

34. Sanders prescribed lamotrigine to Plaintiff in phases of escalating dosage over the course of several weeks.

35. The increasing dosage of lamotrigine exceeded the manufacturer's limitations and was not appropriate for Plaintiff's condition; such use and dosage of the medicine was not within the standard of care.

36. After several weeks of taking the lamotrigine as prescribed by Sanders, Plaintiff developed severe complications and was subsequently hospitalized and diagnosed with Stevens-Johnson Syndrome and toxic epidermal necrolysis.

37. Plaintiff paid $12.75 to River Edge for the lamotrigine prescriptions and provided insurance information to River Edge for her treatment.

38. At some point after the conclusion of Plaintiff's treatment by Sanders, the Debtor sought to relinquish her duties as Medical Director and delegating physician to nurse practitioners.

39. River Edge denied the request and, as a result, the Debtor left River Edge in April 2014.

40. In June 2017, Plaintiff initiated litigation against the Debtor, Sanders, River Edge, and other parties in state court.

41. The Debtor was unaware of Sanders' treatment of Plaintiff until she was served with the summons and complaint in the state court action.

42. The Debtor never spoke to or treated Plaintiff during the time she received services at River Edge.

43. Before learning of Sanders' treatment of Plaintiff, the Debtor had received no indication of deficient performance by Sanders, including writing inappropriate prescriptions, and was unaware that Sanders had ever represented herself to Plaintiff as a "doctor."

44. The Debtor did not establish a formal system for review of patient records treatment by Sanders or any other nurse practitioner at River Edge.

45. Generally, the Debtor reviewed records of patients treated by nurse practitioners to assess the adequacy of care given, only when a nurse practitioner asked a question or a requested a consult.

46. The Debtor did not give any training to Sanders (or anyone else) as to use of lamotrigine, and was not aware whether Sanders had experience or training for the prescribing of lamotrigine.

47. Initially, the Debtor did not have an opinion as to the quality of Sanders' medical treatment abilities.  Later, through review of medical records and communications with Sanders, the Debtor came to respect Sanders' work.

48. The Debtor was not aware of any specific training Sanders may have received; instead, the Debtor relied generally on Sanders' having appropriate licensure qualifications.

49. The Debtor considered herself available for consult with Sanders when Sanders needed it.

50. The Debtor also believed that Dr. Foster would generally be easily accessible to Sanders for a consult, because both of them practiced in the Milledgeville location of River Edge.

51. The Debtor believes that River Edge pressured her and other professionals to see more patients in less time, and that River Edge's operation was focused on profit maximization.

52. The Debtor filed her bankruptcy petition with this Court in August 2017, and the state court action was stayed.

Plaintiff subsequently filed her Complaint initiating this proceeding, in which she alleges that the debt owed her[5] due to the improper medical treatment should be found non-dischargeable because it arose from the representations made by the Debtor and Sanders as her agent, that are within the scope of 11 U.S.C. § 523(a)(2)(A). The Debtor asserts that there exists no evidentiary support for Plaintiff's allegations.

## II.    Conclusions of Law.

### A.    Nondischargeability Standard under § 523(a)(2)(A).

The discharge of debts to an honest, but unfortunate, debtor is central to our bankruptcy laws. Therefore, exceptions to discharge should be construed "liberally in favor of the debtor." *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir. 1994) (citation omitted); *see also Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164-65 (11th Cir. 1995) (court has "obligation to construe strictly exceptions to discharge.").

To prevail under 11 U.S.C. § 523(a)(2)(A), Plaintiff must prove

> that the Debtor obtained money, property or credit from the Plaintiff[]: (1) by false representation, pretense, or fraud; (2) knowingly made or committed; (3) with the intent to deceive or to induce acting on same; (4) upon which the Plaintiff[] actually and justifiably relied; and (5) from which the Plaintiff[] suffered damages, injury or loss as a proximate result.

---

[5] For purposes of this adversary proceeding, the Debtor does not dispute that Plaintiff has a claim against the Debtor, which gives rise to a debt.

8

*Washington v. Robinson-Vinegar (In re Robinson-Vinegar)*, 561 B.R. 562, 566 (Bankr. N.D. Ga. 2016) (citations omitted).

As to the types of fraud referenced in the statute: "A false representation is an 'express misrepresentation.' 'False pretense involves an implied misrepresentation or conduct intended to create and foster a false impression.'" *Navy Fed. Credit Union v. Purse (In re Purse)*, 537 B.R. 28, 36 (Bankr. S.D. Ga. 2015) (citations omitted). "Actual fraud requires showings that the defendant made a false or misleading representation with the intent to induce reliance and that the plaintiff detrimentally relied on the representation." *SunTrust Bank v. Brandon (In re Brandon)*, 297 B.R. 308, 313 (Bankr. S.D. Ga. 2002). "Legal or constructive fraud, which involves an act contrary to a legal or equitable duty that has a tendency to deceive, yet not originating in an actual deceitful design, is insufficient." *Bracciodieta v. Raccuglia (In re Raccuglia)*, 464 B.R. 477, 485 (Bankr. N.D. Ga. 2011).

For each of these three types of fraud, the "common thread is a debtor's intent to defraud a creditor." *Tobias v. Aldvarado (In re Alvarado)*, 608 B.R. 877, 883 (Bankr. W.D. Okla. 2019). "To prove an intent to deceive, 'the debtor must be guilty of positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, or fraud in the law, which may exist without the imputation of bad faith or immorality.'" *They Might Be, Inc. v. Carter (In re Carter)*, 593 B.R. 354, 361 (Bankr. M.D. Fla. 2018) (citation omitted).

As noted by Plaintiff, with respect to a claim brought under § 523(a)(2)(A), "the disqualifying act does not have to be committed *by the debtor*." *Borges v. Placeres (In re Placeres)*, 578 B.R. 505, 517 (Bankr. S.D.N.Y. 2017) (emphasis in original). In other words, vicarious liability can support a § 523(a)(2)(A) claim. *Lioce v. Heinz (In re Heinz)*, 501 B.R. 746, 760 (Bankr. N.D. Ala. 2013, as amended Nov. 13, 2013) ("The Eleventh Circuit has recognized that a debt may be excepted

from discharge either when the debtor personally commits actual fraud or when such actual fraud is imputed to the debtor under agency principles." (citing *Hoffend v. Villa (In re Villa)*, 261 F.3d 1148 (11th Cir. 2001)).

A creditor must prove the elements of her claim of nondischargeability by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). Where a creditor fails to prove any single element of the exception to discharge, the debt is dischargeable. *In re Miller*, 39 F.3d at 304.

Plaintiff asserts that her claim is non-dischargeable by virtue of fraudulent conduct by both Sanders, whom Plaintiff alleges acted as the Debtor's agent, and the Debtor directly—Sanders through her introduction as "Dr. Sanders" and associated atmosphere fostering the impression that Sanders was a medical doctor, and the Debtor through agreeing to obligations under the Protocol Agreement and Medical Director position that she did not intend to meet. Plaintiff contends she relied on these representations because had the Debtor not made such representations, Sanders would have been unable to treat patients, and more importantly would not have prescribed to Plaintiff the medicine that caused her injuries. The Court assesses the conduct of each of these individuals separately.

### B.     Vicarious Liability—Sanders' Conduct.

As noted previously, the Debtor did not directly treat Plaintiff, or even know of Plaintiff's existence until she received a copy of the complaint and summons in the state court suit filed before the Debtor commenced this bankruptcy case. Nevertheless, Plaintiff argues that Sanders made fraudulent misrepresentations, and that such fraudulent conduct is attributable to Plaintiff due to their principal-agent relationship. The inquiry before the Court then is two-fold: did Sanders engage in fraudulent conduct and, if so, is it attributable to the Debtor through an agency relationship?

### 1. *Fraudulent Conduct; Intent.*

The centerpiece of the allegation of Sanders' fraudulent conduct is that Sanders introduced herself to Plaintiff as "Dr. Sanders," and failed to clarify that she was a doctor of nursing rather than a medical doctor. Plaintiff also argues that she heard other staff at River Edge refer to Sanders as "doctor" and that she the prescription bottles she received referenced Sanders as a "doctor." Plaintiff alleges that she justifiably relied on these representations, to her detriment, because she would have asked to see a medical doctor had she known Sanders was not one.

As Sanders holds a doctor of nursing degree, her use of the title "doctor" was not an express misrepresentation, and therefore does not qualify as a false representation under the statute. Such a statement was not false or fraudulent per se. However, Sanders acknowledged that a patient could be confused by her introduction as "doctor" with no clarifying follow-up. In addition, Plaintiff heard staff refer to Sanders as "doctor" and received prescription bottles that referenced a "Dr. Sanders." Therefore, the Court must assess whether Sanders' conduct constitutes false pretenses or actual fraud. To prevail under either of these theories, Plaintiff must show that Sanders' acted with the intent to deceive or to induce reliance.

Determining intent to deceive is "largely an assessment of . . . credibility and demeanor." *In re Miller*, 39 F.3d at 305; *see also In re Carter*, 593 B.R. 354 at 361 ("A determination of whether a debtor had the subjective intent to deceive is an issue of fact and depends largely on the Court's assessment of the credibility and demeanor of the debtor."). "To find fraudulent intent based on circumstantial evidence, the court considers whether the totality of the circumstances presents a picture of deceptive conduct by the debtor which indicates intent to deceive the creditor." *Phillips 66 Co. v. Miltenberger (In re Miltenberger)*, 531 B.R. 228, 235 (Bankr. W.D. Mo. 2015) (internal quotation marks and citation omitted).

The Court finds that Plaintiff has not proven that Sanders engaged in any deceptive conduct or had any intent to deceive or induce reliance by the Debtor. Sanders testified that her intention was to provide medical treatment to Plaintiff and that she never intentionally left a patient with the impression that she was a medical doctor.  Considered within the context of the other evidence presented, the Court finds Sanders' testimony credible.

The other allegations as to Sanders' conduct similarly do not pass muster. Little detail was offered as to what extent and in what circumstances staff at River Edge may have referred to Sanders as "doctor."  Although Plaintiff heard such a reference by staff, the Court finds that such reference by staff was not the norm.  No evidence suggests that Sanders is responsible for the "doctor" reference by staff that Plaintiff overheard.  And although evidence at trial established that the two prescription bottle labels reflected "Dr. Sanders" and "Dr. Julie Use Osborne Sanders" as the prescriber, no evidence was introduced as to how that error occurred.  In the absence of such evidence, the Court declines to assign blame to Sanders.  Georgia law authorizes Sanders to write prescriptions, and she did so here.  The Protocol Agreement obligated Sanders to use prescription forms that reflect the Debtor's name.[6]  Plaintiff offered no evidence or even argument that Sanders or the Debtor bears responsibility for the labels' appearance, and the Court assigns none.[7]

Moreover, Plaintiff did not show that Sanders received any benefit from any of the alleged fraudulent conduct.  Sanders' compensation was unaffected by her treatment of Plaintiff.

---

[6] The River Edge pharmacy created the labels showing "Dr. Sanders" as the prescriber; perhaps the reference to "Dr. Sanders" is the pharmacy's fault.

[7] Whether Plaintiff justifiably relied on the labels is a separate issue (she did), but that issue does not control the outcome of this proceeding.

Contrast this to *In re Berman*, in which a debtor-surgeon "purposefully overstated his credentials and experience to persuade the plaintiffs to have him perform [Plaintiff's] surgeries." *Corsi v. Berman (In re Berman)*, 154 B.R. 991, 1001 (Bankr. S.D. Fla. 1993). Although the debtor in *Berman* was in-fact a doctor, the debtor misrepresented his experience and training in cosmetic surgery by touting self-designated certifications not officially recognized by the state medical boards. *Id.* at 994. The debtor enticed patients to undergo surgery by offering discounts for additional procedures, running advertisements, and using images of models he falsely identified as prior clients. *Id.* at 998. The debtor also falsely claimed to hold admitting privileges at a nearby hospital; when the plaintiff inquired why procedures were taking place in his office, the debtor advised that such measures were taken to lower costs. The court found that the debtor had engaged in a scheme to defraud the plaintiff, and therefore found the debtor's debts for malpractice nondischargeable under § 523(a)(2)(A). Likewise, this case is distinguishable from *Hanft v. Church (In re Hanft)*, 315 B.R. 617, 621 (S.D. Fla. 2002) (doctor consciously decided to suspend renewal payments on medical license, allowed medical license to lapse for a period of ten years and continued treating patients by holding himself out as licensed doctor) and *Abrahamson v. Doyan (In re Doyan)*, 204 B.R. 250 (Bankr. S.D. Fla. 1996) (doctor intentionally misrepresented qualifications and experience, claiming to hold specialties not recognized by state medical associations).

Here, unlike in those cases, Plaintiff has failed to show that Sanders had any intent to deceive or a scheme to defraud—Sanders neither enticed Plaintiff to undergo treatment nor purposefully overstated her training.

The Court finds this case similar to *Mendizabal v. Hernandez-Abreu (In re Hernandez-Abreu)*, 506 B.R. 307 (Bankr. S.D. Fla. 2014), where the court found that the debtor was negligent in his treatment of the plaintiff, but found no intent to

13

mislead associated with the debtor's failure to disclosure lapse of malpractice insurance or substance abuse issues.

Here, the Debtor does not dispute that Plaintiff suffered injuries due to the escalating lamotrigine dose which was negligently prescribed; however, the evidence presented fails to support the allegation that Sanders intended to deceive the Plaintiff.  As in *In re Hernandez-Abreu,* the Court does not believe that Sanders took any action which qualifies as false representation, actual fraud, or false pretenses, within the scope of § 523(a)(2)(A).  Plaintiff has not proven that Sanders had any intent to mislead Plaintiff, foster or cause a false impression, or cause Plaintiff to turn over money or property.  *See In re Hernandez-Abreu*, 506 B.R. at 311-12.

### 2.  *Scope of Agency.*

Even if the Court concluded that Sanders' conduct did satisfy the required elements of § 523(a)(2)(A), such conduct would not be attributable to the Debtor because it is outside the scope of any such principal-agent relationship.  If the fraud is outside the scope of the agency, the Debtor is liable only if the Debtor accepted and retained benefits of the unauthorized act.

For purposes of this analysis, the Court assumes without deciding that Sanders was the Debtor's agent by virtue of the terms of the Protocol Agreement and associated state law and regulation.

"As a general rule, '[w]here the tort of the employee is wholly personal to himself, it is not within the scope of his employment, and the master is not liable.'" *Medley v. Boomershine Pontiac-GMC Truck, Inc.*, 449 S.E.2d 128, 131, 214 Ga. App. 795, 797, (1994) (citation omitted)).  Where the agent "is guilty of independent fraud for his own benefit, the law does not impute to the principal notice of such fraud." *Witcher v. JSD Properties, LLC*, 690 S.E.2d 855, 857, 286 Ga. 717, 719 (2010) (citing *Hodgson v. Hart*, 142 S.E. 267, 165 Ga. 882, 887 (1928)).  A principal can be held

liable only where the fraudulent acts of her agent are committed within the scope of the agency, unless the principal ratifies such acts. *DaimlerChrysler Motors Co. v. Clemente*, 668 S.E.2d 737, 751, 294 Ga. App. 38, 53 (2008). A principal ratifies an act if she, with full knowledge of all the material facts, accepts and retains the benefits of the unauthorized act. *Hendrix v. First Bank of Savannah*, 394 S.E.2d 134, 135, 195 Ga. App. 510, 511 (1990); *see also Reynolds v. L&L Mgmt.*, 492 S.E.2d 347, 350, 228 Ga. App. 611, 614 (1997).

Under Plaintiff's theory, Sanders' conduct was fraudulent. As noted above, the Court has already found that Plaintiff has failed to demonstrate that the Debtor was or should have been aware of Sanders' alleged fraudulent representations to Plaintiff. Indeed, the Debtor was not even aware of Plaintiff's existence until the state court suit was filed.

Plaintiff contends that Sanders used the title "doctor" because she enjoyed the respect it garnered. Under this theory, Sanders' alleged misrepresentation was for her personal benefit, and thus outside the scope of the agency. Because the fraudulent conduct did not occur within the agency, the Debtor is only liable if she ratified the conduct by accepting and retaining benefits of the fraud. The evidence presented in this case fails to show that Debtor accepted and retained any benefit from Sanders' treatment of Plaintiff.[8] The Debtor testified that she received no personal benefit from Plaintiff's treatment. The Court agrees. Thus, the Court finds that the Debtor did not ratify Sanders' alleged fraud. As such, the Debtor cannot be liable for Sanders' acts as a principal even if the Court were to find an agency relationship existed between the Debtor and Sanders.

---

[8] Plaintiff has the burden of proving any ratification. *Hendrix v. First Bank of Savannah*, 394 S.E.2d 134, 135, 195 Ga. App. 510, 511 (1990).

### C.    Debtor's Conduct.

#### 1. *Intent.*

Plaintiff's theory of fraud based on the Debtor's conduct stems from the Debtor's failure to adhere to the requirements of the Protocol Agreement, the Georgia Composite Medical Board's Rules and Regulations, and her position as Medical Director.  Included among these alleged failures are the failure to adequately supervise Sanders, the failure to ensure Sanders was properly trained to prescribe lamotrigine, and the failure to review sufficient amounts of records of patient treatment by Sanders and other nurse practitioners.  Plaintiff argues that the Debtor's failures were so severe and so pervasive that they must be construed as signifying the Debtor's lack of intent to comply at the time she undertook these obligations.

Plaintiff's argument is unpersuasive.  "A debtor's statement of his intent to perform an act in the future will not generally constitute a false representation that is actionable under Section 523(a)(2)(A) unless the creditor can establish that the debtor lacked the subject intent to—or knew that he could not—perform the act at the time the statement was made." *K.A.P., Inc. v. Hardigan*, 560 B.R. 895, 900 (S.D. Ga. 2016) (citations omitted)).  "Thus, Plaintiff bears the burden of demonstrating that the promises Debtor breached were actually made with fraudulent intent from the inception of the underlying transaction . . . ." *Blosser v. Boggus (In re Boggus)*, 479 B.R. 147, 155 (Bankr. N.D. Ga. 2012).  However, because a debtor will rarely admit to fraudulent conduct, a court is permitted to infer fraudulent intent from the facts and circumstances of a case, including the debtor's conduct occurring after the representation at issue.  *Hardigan*, 560 B.R. at 900.

Here, Plaintiff has failed to establish that, at the times the Debtor signed the Protocol Agreement and agreed to become Medical Director, she had no intent to perform or knew that she was unable to perform the obligations required of her.

16

Even when considering circumstantial evidence, as is proper in this context, the Court cannot reach such a conclusion based on the evidence presented at trial. Rather, what Plaintiff has demonstrated at most is that the Debtor failed to fully appreciate her obligations under the Protocol Agreement, job description, and associated regulations.  Rather than affirmatively lacking intent to follow through with these obligations, the Debtor viewed the delegating physician/nurse practitioner relationship as one where the physician should be available for consults or questions from the nurse practitioners.  It is apparent that, to a large extent, the Debtor's understanding of the delegating physician/nurse practitioner relationship was incomplete.[9]  However, Plaintiff failed to prove that this mistake by Debtor was anything other than negligence.  The evidence at trial revealed nothing to suggest that the Debtor acted with intent to deceive or defraud, bad faith, or immorality. *See DSC Nat'l Properties, LLC v. Johnson (In re Johnson)*, 477 B.R. 156, 172 (B.A.P. 10th Cir. 2012) ("Lacking an awareness that he is deceiving . . ., either about the fact itself or about his confidence in his knowledge of the fact, he cannot possess an intent to deceive."); *see also In re Carter*, 593 B.R. at 361–62 ("[I]f there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor." (citation omitted)).

Moreover, the evidence reveals that the Debtor signed the Protocol Agreement at River Edge's insistence.  It was River Edge, rather than the Debtor, who benefited from the Protocol Agreement.  The Debtor's compensation was not affected by the treatment Plaintiff received at River Edge.   Plaintiff has failed to prove that, at the time the Debtor signed the Protocol Agreement or accepted her

---

[9] For example, the Court finds credible that the Debtor acted in good faith to review patient medical records to evaluate the performance of nurse practitioners, even though the review was usually prompted by a nurse practitioner inquiry.

position as Medical Director, she had no intent to perform or knew she could not perform the obligations thereof.

Plaintiff correctly asserts that a debtor's reckless disregard for the truth or falsity of a statement can be considered in assessing non-dischargeability under § 523(a)(2)(A).  The Eleventh Circuit has held that reckless disregard for the truth or falsity of a statement can be equivalent of a "false representation." *Birmingham Trust Nat'l Bank v. Case*, 755 F.2d 1474, 1476 (11th Cir.1985), superseded on other grounds Pub.L. No. 98–353, 98 Stat. 333 (1984).  However, false representation is only one element of a § 523(a)(2)(A) claim.  Intent to deceive or induce reliance remains a separate element.  *See In re Miller*, 39 F.3d at 305 ("A bankruptcy court may look to the totality of the circumstances, including the recklessness of a debtor's behavior, to infer whether a debtor submitted a statement with intent to deceive.").  Indeed, courts have recognized that

> recklessness alone does not equate to fraudulent intent; it is only probative of intent.  "The essential point is that there must be something about the adduced facts and circumstances which suggests that the debtor intended to deceive" the creditor. As the court noted in *In re McGuire*, the focus must be on "the totality of the circumstances and whether they create the overall impression of a deceitful debtor."

*Huskey v. Tolman (In re Tolman)*, 491 B.R. 138, 154 (Bankr. D. Idaho 2013) (citations omitted).  Considering the totality of the circumstances in this case, the Court cannot find that the Debtor acted with any improper intent, even if the Court considered the Debtor's conduct reckless (which it does not).

In summary, the Plaintiff has offered insufficient circumstantial evidence from which the Court can infer that the alleged false representation was made with the intent to deceive.

## 2. *Reliance.*

Another obstacle that Plaintiff fails to overcome is that she did not prove she was aware of the Protocol Agreement. One can of course not justifiably rely on an agreement one doesn't know exists. *See, e.g., Silvestri Homes WNY, LLC v. Jones (In re Jones)*, 604 B.R. 443, 457 (Bankr. W.D. Pa. 2019) (creditor cannot rely on misrepresentation of which he was unaware).

Nevertheless, Plaintiff argues that Georgia law supports a finding of fraud based on reliance of the Debtor's representations to a third party, citing *Fla. Rock & Tank Lines, Inc. v. Moore*, 365 S.E.2d 836, 258 Ga. 106 (1988). Under the *Florida Rock* doctrine, in certain circumstances a fraudulent representation can be made to and relied upon by a party other than the plaintiff.

Th *Florida Rock* doctrine does not rescue Plaintiff's cause. In *Florida Rock,* the question before the court was only one of reliance—there was no question that the defendant had made a fraudulent misrepresentation:

> The evidence in this case clearly authorized findings that appellant had made representations regarding his future payment for the gasoline, that he had no present intent to make the future payment and knew that his representations were false, and that he had made the false representations with a deceitful intent and purpose . . . .

365 S.E.2d at 837, 258 Ga. at 107. The court specifically referenced the defendant's "original goal of defrauding" a party, and remarked that "this is not a case of a person being held accountable for an act he never intended to commit, or becoming liable to another whom he never intended to defraud." *Id.* Indeed, the express holding of *Florida Rock* is necessarily conditioned on a finding of "objective to defraud" and "purpose of defrauding." *Id.* Here, of course, Plaintiff has not demonstrated that the Debtor had any objective of or purpose to defraud Plaintiff. *Florida Rock* and its progeny are inapposite to the instant proceeding.

### 3. *Obtained Money, Property, or Credit.*

As for the issue of whether the Debtor obtained money, property or credit from the Plaintiff as a result of the alleged fraud as required by § 523(a)(2), Plaintiff argues that the Debtor avoided termination of her employment by River Edge as a result of the fraudulent conduct, and also was able to see more patients (through Sanders).

The Eleventh Circuit applies the "receipt of benefits" theory for § 523(a)(2), which requires only that the debtor benefit in some way from funds paid by the creditor on account of the fraud. *HSSM #7 Ltd. P'ship v. Bilzerian (In re Bilzerian)*, 100 F.3d 886, 890 (11th Cir. 1996). Such benefit may be either be direct or indirect; "a debtor need not personally obtain the fruits of his fraud." *Kondapalli v. DeMasi*, 551 B.R. 653, 660 (M.D. Fla. 2016).

Although the Debtor received regular compensation from River Edge, Plaintiff failed to prove that Debtor benefited from the funds paid to River Edge by Plaintiff. Because Debtor received no financial compensation or incentive for the treatment of patients, the connection between Plaintiff's payment and Debtor's salary is too tenuous to suffice as either a direct or indirect benefit of fraud.

Plaintiff argues that Debtor's ability to maintain her role as Medical Director required her to act as delegating physician for advanced practice registered nurses. To support this position, Plaintiff offered Debtor's testimony regarding a communications between Debtor and River Edge CEO Shannon Harvey which ultimately led to Debtor's resignation in April 2014. These communications arose several months after the Plaintiff's treatment, when the Debtor attempted to reduce the scope of her role as Medical Director. The Court finds this evidence conjectural and unpersuasive. There is no indication that, at the time of the treatment of Plaintiff, the Debtor had any notion that her continued employment at River Edge was contingent upon her continued service as Medical Director. In strictly

20

construing § 523(a)(2)(A), as the Court must, the Court finds the Plaintiff failed to establish a preponderance of evidence in her favor.  In this case, the Debtor's future conduct fails to suffice as evidence proving the Debtor received financial benefit from Sanders' misrepresentation.

## III.    Conclusion.

Plaintiff without question has suffered severe injuries due to the actions of other parties.  However, the Court's task is not to decide whether severe injuries occurred or whether other parties are at fault, but rather whether the conduct of Debtor is such that she should be charged with a non-dischargeable debt on account of Plaintiff's injuries.

For the foregoing reasons, the Court finds that the debt is dischargeable. Plaintiff has failed to carry her burden as to the elements of § 523(a)(2)(A), most predominantly that of intention to mislead, defraud, or induce reliance.[10]  In reaching the conclusions found herein, the Court has considered all the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Order.

The Court will enter a Judgment consistent with this Opinion, in accordance with Bankruptcy Rule 7058.

[END OF DOCUMENT]

---

[10] Because Plaintiff has failed to prove the above-discussed elements of § 523(a)(2)(A), there is no need to consider the other elements required under the statute.